Daniel
vs.
Thomson, &c.

---

14m 508
92   643
14bm533
103  258

Case 39.

## Daniel *vs.* Thomson, &c.

### ERROR TO BOURBON CIRCUIT.

[NOTE.—The writ of error in this case was sued out in June, 1847. The case was heard at the winter term, 1847, before Judges MARSHALL and BRECK—Judge SIMPSON having decided the case in the circuit court could not set. No decison having been given, and Judge BRECK having resigned, the case was again argued before Judges MARSHALL

and GRAHAM at the summer term, 1849, and at the winter term, 1849, an opinion was delivered affirming the decision of the circuit court. This affirmance was suspended by a petition for a re-hearing, during the pendency of which the constitution of the court was materially changed, and a re-hearing having been ordered, the cause was again elaborately argued at the winter term, 1851, before Judges HISE, MARSHALL and CRENSHAW, and this opinion delivered by Judge MARSHALL—which is substantially the same as the first opinion rendered in the case.                    REP.]

A testator devised to his sons J. K. T. and C. R. T. several slaves and a tract of land, in one clause of his will, "to them and their heirs forever." In a codicil attached to the will is the following clause: "It is my wish that all the property that may be included in this my last will and testament, to my sons C. R. and J. K. Thompson, in case either or both dying without leaving a lawful heir, begotten of their own body, in that case, the property so left shall be equally divided among their sisters, or their legal representatives." Held—1. That the sons took a defeasable fee in the land, subject to be defeated upon their death without leaving issue of their bodies living at the time of their death—it was not an estate tail. 2. That the limitation over to the sisters was not too remote, but valid; not in conflict with the law against perpetuities.

Clifton Thomson, by his will dated in April 1828, and written wholly by himself, gives to his wife three slaves, "to her and her heirs forever," and lends to her during life two others, "to return, after that period, to his undivided property." He also lends to her two hundred acres of land where he lives, (describing it,) during her natural life, then to be the property of James K. Thomson, "and his heirs forever." He also lends to his wife various articles of personal property, of which all that is not used for her benefit, to be the property of his son, J. K. Thomson, also his secretary, &c., to him "and his heirs forever." After devising separately to three sons-in-law several slaves, and the money, &c., which had been previously received, each devise concluding "to him and his heirs forever," he devises to his son, William Z. Thompson, one slave and the money, &c., previously received, and also one half of the land he (the testator) possessed after laying off (to his wife) the two hundred acres as before mentioned, "to him and his heirs forever." Then follow devises to two other sons-in-law, of slaves and money, &c., as before, each concluding "to him and his

Case stated.

*heirs for ever."* In the next clause he gives to his son, Clifton R. Thomson, three slaves, &c., and one-half of the balance of his (testator's) land, after taking off two hundred acres before mentioned, for the use of his wife, and designating the division line between William Z. and C. R., so as to make the two surveys equal, concludes the clause thus : "one-half to William Z. Thomson, the other half to Clifton R. Thomson, to them *and their heirs forever."*

The testator then gives to his daughter, Emerine Thomson, four slaves, &c., and various personal property, and provides, that, "in case she may die before marriage or she comes of age, the property herein named devolves into the common stock hereafter named." He then gives to James K. Thompson three slaves, &c., and the land designated to the use of his mother, and provides that "the property herein (given) to his son J. K. T., in case he may die before he comes of age of twenty-one or marries, in that case it shall be equally divided between all my daughters, or their legal representatives." Then follows a clause directing that all the property, not expressly bequeathed by the will, shall, in some way, be divided between all his (testator's) daughters, "or their legal representatives, to-wit, Henry Daniel, William R. Morton, James Rodes, Manlius Thomson, (who were his sons-in-law,) and Emerine Thomson, (his unmarried daughter.) And the sons William Z. and C. R. are named as executors. By a *nota bene* or codicil, without date, all of the testator's money and bonds are directed to be divided between all of his daughters, "or their legal representatives." A second *nota bene* makes the daughter, Sarah R. Rogers, one of the beneficiaries in the residuary devise. A third addition, in December 1831, alters the division line between William Z. and C. R. Thomson. And the last addition, made in 1832, after giving directions in relation to a pecuniary matter, contains the provision on which the present controversy arises, which is in the following words: "It is my wish that all the property that may be

included in this, my last will and testament, to my sons Clifton R. Thomson and James K. Thomson, in case either or both dying without leaving a lawful heir begotten of their own body, in that case, the property so left shall be equally divided among *their sisters, or their legal representatives.*" The will and additional clauses, all in the hand-writing of the testator, were admitted to record in the Fayette county court in September 1833, and the devisees immediately divided and took possession of the land. In October 1833, C. R. Thomson sold and bound himself to convey, on demand, his portion of the land to Henry Daniel, his heirs, and assigns, for the consideration of $3,000, of which $800 were to be paid in nine months, and the residue in equal annual installments of $200 a year afterwards, but with the express provision that if the said C. R. T. should die before all the payments should be made, or should marry and have a child by his legal wife, said payments should cease and determine, and Daniel should not be bound for any part of the money then unpaid—possession to be delivered immediately, which was done. In 1840 C. R. Thomson conveyed the land to H. Daniel, in fee simple, and without condition, for the recited consideration of $3,000, acknowledged to have been paid. In March 1845 C. R. Thomson died unmarried, and without child or descendent, and in March 1846 this bill was filed against H. Daniel and his wife, (one of testator's daughters,) and against Daniel's tenant on the land, by two surviving sisters of C. R. Thomson, and the heirs of three others, claiming that under the clause in the codicil above quoted they were entitled, with Mrs. Daniel, to the land which had been devised to C. R. Thomson, and asking for partition and other relief. This claim was resisted by Daniel on the ground, that upon the whole will, C. R. Thomson had an estate tail, converted by our statute into a fee simple, and that the devise over in the codicil, after an estate tail and upon the contingency described, is wholly invalid.

Upon the hearing it was decreed that the devise over in the codicil was valid, and that the complainants were entitled to partition, &c. In June 1847 Daniel sued out a writ of error for the reversal of this decree, and Judge Simpson, by whom it was rendered in the circuit court, having been appointed a judge of this court, the cause was elaborately argued before Judges Marshall and Breck. In consequence of the resignation of Judge Breck the cause was again argued, and by the concurrence of Judges Marshall and Graham the decree was affirmed. This affirmance was suspended by a petition for re-hearing, during the pendency of which the constitution of the court was again materially changed, and a re-hearing having been ordered at the last term, the cause has been argued at the present term before Judges Hise, Marshall, and Crenshaw, and is to be now finally decided. The long pendency of the case in this court, the unprecedented number of re-arguments, and the ability and research which have characterised the discussion on each occasion, as they have exacted from the court a careful consideration of the principles involved, so they seem to repuire from it a careful statement of the views on which its conclusions are founded.

The claims of the contending parties depend, as will have been perceived, upon the validity or invalidity of the devise over in the last codicil. The invalidity of the devise has been placed in argument upon two grounds : 1. That C. R. Thomson had, by the whole will, an estate tail, after which, according to our laws, no valid limitation could be made; and 2. That the contingency upon which the devise over is to take effect being, by the settled and technical interpretation of its terms, unlimited as to time, and being such as might not happen for an indefinite number of years, or even generations, is therefore too remote, and the devise dependent on it must consequently fail. But since, as will be hereafter shown, the question whether an estate tail was given to C. R. T. depends wholly and exclusively upon the question

whether the contingency on which the devise over depends is sufficiently restricted, or is left indefinite, the first question resolves itself into the last, which is, in truth, the only subject of inquiry.

It is indeed contended, that although in the direct devises to his two sons, C. R. and J. K., the testator gives to them and their heirs, &c., yet, by afterwards using the words heir of their own bodies, &c., in describing the contingency on which the devise over is to take effect, he shows that he intended heirs of the body, by the word heirs in the prior devises. But if the testator did not suppose that the word "heirs" alone meant heirs of the body, he did not mean heirs of the body by the word "heirs" in the direct devises; and if he did suppose "heirs" meant heirs of the body, and used the word in that sense in the first devises, why was he not content with using the same word to signify the same thing in the codicil, and why did he take so much pains to designate heirs of the body, when, from the mere fact of devising over the estate to those who would be general heirs, the word heirs alone, used in expressing the contingency, would have been necessarily understood as meaning heirs of the body? If in the codicil, he had used the word "heirs" without qualification, there might be some grounds for infering that, as he certainly used it there in the qualified sense of heirs of the body, he had also used it in the same sense in the body of the will. But when in the body of the will he has used the word "heirs" some eight or ten times, in describing the estates given, and when, in the codicil, he has most carefully qualified the word "heir" by additional restrictive words indicating heirs of the body of two of the devisees, the fair inference is, that he knew the difference between "heirs" and "heirs of the body," and that he used the former word in the direct devises in its proper and unrestricted sense. If, from the use in the codicil, of the words "heirs of their bodies," in reference to two of the original devisees, it must be inferred that by the word "heirs" in the direct devises to them

DANIEL
vs.
THOMSON, &c.

the testator meant heirs of their bodies, we do not see how the inference is to be avoided, that by the same word used in the other direct devises the testator meant the same thing, which would be a most rash, and, we think, inadmissable presumption.

In the original will the testator has given, in one instance, an estate for life; to most of the devisees he gave estates in fee simple, without condition or restriction ; and to two he gave estates in fee, subject to be defeated by the death of the devisee unmarried, and before attaining full age. These dispositions are intelligible and certain, and made in language which, though not entirely grammatical, is clear and appropriate. The necessary presumption is, that he understood the words which he used, and that the dispositions made accorded with his intention. Four years afterwards the testator, in view of the condition and prospects or exigencies of his family, made a secondary and contingent disposition of the property previously devised to two of his sons, which is, to some extent, inconsistent with the estates given by the first devises to them, and which thus far implies a modification of the previous devises, in order to give effect to those which were afterwards founded upon them. The rational consequence would seem to be, that while in order to give effect to every part of the will, according to the intention of the testator, the primary devises must be modified so far as is necessary to effectuate those which follow—they should be modified to no greater extent, unless in obedience to the intention of the testator, as fairly deducable from the will. It is plain enough that it was intended that the contingency on which the property previously given to C. R. Thomson was devised over to his sisters, should terminate the estate before given to him. Did the testator look to and mean to provide for the possible termination of that estate, at the death of C. R. T., or did he intend to provide for it at whatever period it might occur? We do not infer from the words 'heir of his body,' in describing the contingen-

cy, that by the words 'his heirs,' used four years be-
fore in drafting the original will, the heirs of his body
were intended to be designated.    But the testator had
the power, when he made the codicil, to restrict at
pleasure the estate previously devised; and if it is to be
fairly inferred, from the provision then made, that he
intended thereby to make the estate which he had pre-
viously devised to C. R. T. and his heirs, descendible
only to the heirs of his body, as if it had been so
originally devised, then, in conformity with this intent,
the devises taken together may be understood as giv-
ing an estate to C. R. T., and the heirs of his body,
(which would be an estate tail,) and as giving to the
ultimate devisees a remainder either contingent, and
to take effect only upon the failure of C. R. T.'s is-
sue, at the time of his death, or vested and to take
effect whenever, at any time after his death, there
might be such failure of issue.    There is, however, no
possible ground for inferring the intention to give an
estate tail to C. R. T., or to change the fee simple be-
fore devised to him into an estate tail, unless such in-
ference may be deduced from the terms and nature of
the contingency on which his estate is to determine,
and that of the ultimate devisees is to take effect.
Nor can any such inference be deduced from the con-
tingency itself, unless, upon the ground that it evinces
such an intention to provide for the issue of the first
devisee, as necessarily implies that the testator in-
tended the issue of C. R. T., if any, to take the es-
tate by descent, and in succession, as long as there
should be such issue.    If such an intention be suf-
ficiently manifested in the will, then an estate tail was
intended.

But although a devise over, upon failure of issue of
the first devisee, however described, may tend to show
that the testor had the issue in contemplation, and in-
tended or expected some benefit to them, if there
should be any, this inference is not of sufficient force
to reduce an estate devised in fee simple, to an estate
tail, unless, from the nature and terms of the contin-

gency, properly interpreted, it is to be understood as referring, not to a failure of issue at the death of the first devisee, but to a failure whenever it might happen, either at or after his death. If the devise over is so limited that it may take effect upon the failure of issue, whenever it may happen, which is called an indefinite failure of issue, then there is a manifest intent to control the devolution of the estate indefinitely, by confining the descent to the issue of the first devisee, as long as there shall be any, and by passing it over to the ultimate devisees or their heirs, whenever the designated issue shall fail, which intention could only be carried out by an estate tail in the first taker, and would, if directly expressed, give in form an estate tail. But if the devise over is limited to take effect, not whenever the issue of the first devisee shall fail, but only in case of there being none at the time of his death, then the inference in favor of the issue is satisfied by the benefit presumably resulting to them from the fee simple devised to the ancestor, whereby he is enabled to provide for his issue, if there be any, at his death, or at any rate no such inference arises in favor of the issue as to control, for their benefit, the devise in fee simple to their ancestor. But it remains, according to the terms of its creation, a fee simple, made defeasible for the benefit of the ultimate devisee by the failure of issue of the first devisee at the time of his death, but indefeasible and therefore subject to his prior alienation if he leave issue. In such a case, the reference to the failure of issue has no effect upon the devise in fee, but that of making it defeasible on the contingency described, and the devise over is valid as an executory devise, dependent upon the contingent determination of the previous fee simple, at the death of the first devisee, and is not a remainder upon an estate tail, because there is no such estate in the case.

These propositions have been stated with reference to adjudications in England, where estates tail are not only allowed as valid dispositions of land, but were

for a long time indefeasible; where such estates, being, agreeable to the nature of the government, and to the notions of land holders, were almost universal, when almost every will presented for adjudication seems to have contained some disposition in tail, and where, consequently, it might almost be presumed, before reading a will, that it contained some such disposition. The case of *Pell v. Brown, Croke James*, 590, understood to be the first of these adjudications, which gave a restricted interpretation to the words "if he die without issue," was decided when this presumption may be supposed to have been somewhat weakened by the growing use of fines and recoveries, as means of opening entails, and of barring the issue and the remainderman, in derogation of the statute *de donis*.

In that case a devise in fee simple to A., was followed by the devise "that if A. should die without issue living, B., his brother, should have the lands to him and his heirs; and it was decided that the devise over was not upon an indefinite failure of issue, but upon a contingent failure, by the death of A. without issue in the lifetime of B., and this contingency having occurred, it was decided that A. took an estate in fee simple, and not in tail; that the devise to B. was good as an executory devise, and that, as his estate was not dependent upon that of A., it was not barred by the recovery suffered by A. The case of *Hansberry v. Cockrell, Rolls ab.*, 835, *page* 4, and that of *Gulliver v. Wickett*, 1 *Wilson*, 105, and other cases in which the devises in fee simple were followed by the clause, "if he should die under twenty-one years of age, and without issue," coming down to the modern case of *Buckworth v. Thylkel*, 3d *Bos. & Puller*, 651, *note a*, in which the devise over was "in case M. B., (the devisee in fee) should die under twenty-one, and without leaving issue," are similar in principle to that of *Pell v. Brown*. In the earlier of these cases it was decided, and in the last assumed, that there was no estate tail but valid executory devises after a fee simple, defeasible on the contingent failure of issue of the devisee in

fee, at the time of his death within the period referred to. The cases decide, therefore, that the words "if he die without issue, (or heirs of his body,") are not inflexible in their import, as referring to an indefinite failure of issue, but may be restricted to their natural meaning by other words—that if thus restricted the inference that "heirs," in the first devise, was used in the sense of "heirs of the body," and every other inference in favor of an estate tail is repelled, and that the restrictive words in those cases were sufficient for this purpose. They did not, however, decide that no other words could have the same effect; nor, although the restrictive words in those cases were contained in the clause describing the contingency, did they decide, that no words outside of that clause could have the same effect; on the contrary, as the departure from the technical sense of the words must have been made in those cases, upon the sole ground of an apparent intention not to use them in that sense, the cases subject the words "if he die without issue" to the question, in what sense did the testator intend to use them? And this question, like every other question of intention and interpretation, must, according to principles now well established, be determined not merely by the particular clause to be interpreted, but by all the words and circumstances which are calculated to illustrate the question. For it is a cardinal rule, in the construction of wills, that the intention is to be collected from the whole will, and that the intention thus ascertained must prevail, if it be agreeable to the rules of law.

These principles have been for ages unhesitatingly applied to the enlargement or restriction of the ordinary sense of common words, and to modifying or changing the technical sense of technical words. And it has been repeated again and again by eminent judges, that "there is no magic in particular words, but their effect must depend upon the sense they bear; and this is to be collected from the whole will taken together." And yet there seems to have been, from the earliest cases on wills, a reluctance at first insu-

perable, and afterwards more or less difficult to be overcome, as the judge gave more or less importance to technical words, to depart from the artificial sense of the particular words "if he die without issue, or heirs of his body," and to admit the sufficiency of other words or circumstances to bring them back to their natural sense. The tenacity with which the technical sense of these words has been adhered to, with the effect of making them reduce the technical sense of the technical word "heirs" in the preceding devise, seems the more strange when it is recollected that the words "if he die without heirs of his body" had acquired their technical effect of denoting an indefinite failure of issue, from their having been used in connection with the gift to a man and the heirs of his body, when, in whatever sense they were used, the condition and law of the gift remained the same, and that it was only by implication of an intention to use them in the same sense, and with the same effect, that when found in another connection, they could properly receive the same unnatural interpretation as in their original context. The word "heirs," and the term 'heirs of his body,' the interpretation of which, as words of limitation, embracing the whole line of heirs or heirs of the body, is as fixed and certain as the interpretation of words can be made by use and the adjudication of courts, have yet been understood as words of purchase, designating children or others who might be heirs or heirs of the body at a particular time, on the ground that other words or circumstances in the will, sometimes slight, indicated an intention on the part of the testator to use them in such restricted senses, (see *Prescott v. Prescott's heirs*, 10 *B. Monroe*, 56, and the cases referred to.) And it would seem, (as remarked by an able commentator on the rule in Shelly's case, 7 *vol. Law Library*,) that some judges have been disposed to give more effect to the implication of an estate tail, from the use of the words "if he die without issue or heirs of his body,"

DANIEL
vs.
THOMSON, &c.

than to a direct devise in words appropriate for the express creation of such an estate.

Under this disposition of the courts and judges in England, to be accounted for in part by their regard for precedents, and in part perhaps by a general presumption that testators in that country intend to devise their lands in tail, and because, for a long time, there could be no further disposition of the estate after a gift to a man and his heirs, except by considering the word heirs as meaning heirs of the body, and thus reducing the apparent fee simple to a fee tail, which would sustain the remainder. It has been decided in many cases, and perhaps without variation, that the words "if he die without issue, or heirs of his body," referring to a previous devise in fee, and introducing a devise over, would, if unrestricted, cut down to an estate tail the apparent fee simple previously given. But when executory devises, dependant on a failure of issue of the devisee in fee, came to be allowed, the question was constantly made as to what variation, if any, from this description of the contingency, or what other words or circumstances, if any, would restrict the contingency and prevent the effect just stated. In *Hurd v. Lyon,* decided in the 19th or 20th year of Elizabeth, and reported twice by *Leonard* 2; *Leon.* 11; *and* 3 *Leon.,* 68, and which was decided before there was any example of an executory devise based upon the failure of the issue of the first devisee being held valid; the testator devised his manor to his wife until his son and heir should arrive at the age of twenty-four years, and then his wife to have one-third of it for life, and his son the residue; and if his son should die before his age of twenty-four years, without issue of his body, that the land should remain to J. S., remainder over. The question was whether the son, having passed his age of twenty-four years, had an estate tail in two-thirds of the manor, under in the will, or had the whole in fee simple by descent. Dyer and Manwood, judges, decided that he had the whole in fee simple by descent, for the tail did not rise unless

he died under the age of twenty-four, but were of opinion that if he had died under that age the entail would have vested with remainder; thus showing that, in that age, the restrictive words "before he come to his age of twenty-four years," were applied only to the time of his death and not to the failure of his issue, or that no restrictive words were then deemed sufficient to change the import and effect of the words "if he die without issue." This case has been sometimes mentioned as authority for the decision in *Pells v. Brown;* but in the material point just noticed it seems to be directly opposed to that case and the others which have been cited, for if there had been an immediate devise of one-third to the wife, and the residue, (which might carry the fee in the whole,) to the son, and if he die before he come to his age of twenty-four years, without issue, over to J. S., it is entirely manifest, from the opinions expressed, that the court must have decided that the devise gave him an estate tail. We have noticed the case to contrast it with the others which have been referred to, and to show that the most ancient decisions are not always the best precedents for questions arising in the present day. It can scarcely be doubted, that if shortly after the enactment of the statute *de donis*, a gift had been made to a man and the heirs of his body—and if he die without heirs of the body, living at the time of his death, to revert to the donor and his heirs, the restrictive words would have been disregarded as repugnant or senseless, and the right of reversion inherent in the gift itself, without any condition expressed, would have still subsisted though the donee left issue at his death, and would have taken effect whenever the issue might afterwards fail.

But to return from this digression, although it was decided in the case of *Pells v. Brown*, and other ancient cases, that the restrictive words found in the contingent clause itself were effectual to restrain its meaning, the case of *Chadock v. Cowly, Cro. James*, decided only a few years after *Pells* and *Brown*, shows that a

DANIEL
vs.
THOMSON, &c.

devise over to the *survivor* of two devisees in fee, if either should die without issue, was not them deemed sufficient to restrict the indefinite import of the words, referring to the failure of issue, or to repel their effect in reducing the apparent fee to an estate tail. There are doubtless other cases of the same sort. There are cases too in which it has been decided, that though the devise over, if the first devisee die without issue, be to one expressly for life, even this indication of the sense in which the words "if he die without issue" were used, was held not to restrict their indefinite import. *Barlow v. Slater*, 17 *Vezey*, 479; *Sellibridge v. Adie*, 1 *Mason's Rep.*, 234. In the former of these cases the master of the rolls said, that such a circumstance had never changed the construction. "The failure might happen during the life of the devisee for life, and this was a chance for her." In the other case it was said, that a life estate might be limited after an estate tail, as well as after an estate in fee. But neither of these remarks meet the question, in what sense did the testator use the words "if he die without issue," and whether the devise over for life did not show that he looked to the contingency as one that was to be determined within a life in being, and that he intended to describe it as such? These cases are directly contradicted by decisions in this and other courts, in which a devise to several, in fee, and in case either should die without issue over to the survivor, has been held not to create an estate tail with remainder, but a defeasible fee simple, and a valid executory devise. The circumstance that the devise over is expressly for life, is even a stronger evidence of an intention to restrict the contingency than a devise over to the survivor, which, under our law, would carry the fee, and devise over for life has been held in this court to be sufficient evidence of such intention. *Brown's heirs v. Brown's devisees*, 1 *Dana*, 39

The case of *Porter v. Bradley*, 3 *Term Rep.*, 143, is also opposed to the English cases just referred to, and carries out the principle of *Pells v. Brown*. The de

vise was to testator's son, P. D., his heirs, and assigns, forever, but in case he should happen to *die and leave no issue behind him,* testator's wife to take the rents and profits during her widowhood, and after her decease or marriage, he gave the land, for want of issue of his son, P. D., to his son, J. D., his heirs and assigns forever, chargeable with the payment of £50 a piece to his six daughters and their issue, in a twelve month after he shall so enjoy the same. P. D. died without leaving issue at his death, and it was decided that he took a fee simple under the will, and that the devise over was good as an executory devise. Lord Kenyon said that the words *leaving no issue behind him,* brought the case within that of Pells and Brown, which he called the *magna charta* of executory devises of this character. He intimated that the words leaving no issue would be sufficient, but said these were even additional words *leaving no issue behind him,* which necessarily import that the testator meant at the time of his son's death. And he noticed that the same idea was conveyed by the subsequent parts of the will, which refer to the events as likely to happen in the life time of his widow, or of his younger son and daughters.

In the case of *Roe v. Jeffreys,* 7 *Term. Rep.,* the devise was to T. F. and his heirs forever, and in case he should depart this life and *leave no issue,* then to E. M., and S., the daughters of M. and W. F., or the survivor or survivors of them, to be equally divided betwixt them, share and share alike. T. F. died without issue, and it was decided that he did not take an estate tail, but a fee simple, and that the devise over was good as an executory devise. Lord Kenyon said the question (as to the meaning of the contingency) was one of intention; that on looking through the whole will the court had no doubt but that the testator meant that the dying without issue was confined to a failure of issue at the death of the first taker, for the persons to whom it is given over were then in existence, and life estates only are given to them, and that, taking all this into consideration, it was impossi-

DANIEL
vs.
THOMSON, &c.

ble not to see that the testator intended a failure of issue at the death of the first taker. But it is to be observed that the devise over to E. M., and S., was not expressly for life, but only constructively so because there were no additional words.

In the case of *Doe v. Webber*, 1 *Barn. & Adolp.*, 713, *A. D.* 1825, the devise was to M. H., her heirs and assigns forever, and if she should happen to die and leave no child or children, then to J. B. and her heirs forever, paying the sum of £1,000 unto the executor or executors of M. H., or to such person as she, by her last will and testament, shall direct. The devise over was decided to be good as an executory devise on the ground that taking children to mean issue as the court did, it was sufficiently apparent that the testator intended a failure of issue at the death of the first taker. Lord Ellenborough said the devise to M. H. in fee enabled M. H. to dispose of it among her offspring, if she should leave any at her death, and referring also to the directions for payment of the £1,000 to her executors, &c., if she should leave no issue, said the case was like *Roe v. Jeffreys*. He also cited *Porter v. Bradley*, and *Doe v. Wetton*.

In the case of *Moody and wife v. King*, 2 *Bingham*, 447, *A. D.* 1825, the testator devised all his houses and lands to W. F. and his heirs forever, (subject to an annuity,) and if W. F. should have no issue the estate is, on the decease of W. F., to become the property of the heir at law, subject to such legacies as W. F. may leave to the younger branches of his family. W. F. died without issue, and the question was as to the right of his widow to dower. It was conceded on both sides that W. F. had not an estate tail, but a defeasible fee, and the case was decided on that ground.

In *Buckworth v. Threlkel*, 2 *Bos. & Pul.*, 651, *note a*, already referred to, the devise over was in case M. B., the devisee in fee, should die under twenty-one and without leaving issue. The question was upon the right of her husband to curtesy, she having died with

out issue, the court decided that she had the fee simple until her death; which is in accordance with the cases first referred to, of a dying under twenty-one and without issue.

In *Doe v. Wetton,* 3 *Bozanquet & Puller,* 324, A. D. 1800, referred to by Lord Ellenborough in *Doe v. Webber, supra,* the devise was to testator's wife for life, and after her death to his daughter, S. S., her heirs and assigns forever, but *if she should happen to die leaving no child or children lawful issue of her body, living at the time of her death,* then over. It was argued, even in this case, that there was a manifest intention to provide for the issue, grandchildren as well as children, and that it could only be satisfied by an estate tail. But Lord Eldon said, "however this may be, the question is whether the issue were intended to be benefitted by the will, or by some disposition to be made by S. S. If she had children living at her death, she had abundant power to provide for both children and grandchildren. Nothing, however, is given to them in this will, they are only named in the description of the contingency." In this case of *Doe v. Wetton,* the contingency was restricted as conclusively as it could be done by words, and the case has been noticed not as furnishing an exact precedent for the construction of the will now before us, but as furnishing, in all cases in which the contingency is sufficiently restricted, an answer to the inference of an intention to provide for the issue, and because this, as well as the other cases cited, show that this inference is not to control the decision of the question whether the contingency is sufficiently restricted, but is to be controlled by it.

But the cases of *Porter v. Bradley, Roe v. Jeffreys, Doe v. Webber,* and *Moody and wife v. King,* come very near being exact precedents, since each varies slightly from the ordinary form of referring to the death of the first devisee without issue, and the three first use the word *leaving,* which is also used in this will. And it is evident that they were decided mainly upon that

word, which had in a series of cases, upon devises of chattels and personalty, reported by Pr. Williams and Atkyns, been decided to be sufficiently restrictive to confine the failure of issue to the death of the first taker. And Lord Kenyon said in *Porter v. Bradley* that it would be difficult to pursuade him that the same word ought to have a different meaning, in reference to the different species of property.

True, we have been referred to other cases decided within the same period, in which although the first devise was in fee, and the word *leaving* was used in introducing the devise over after failure of issue, an estate tail was inferred and established. The earliest of these cases is that of *Daintry v. Daintry*, 6 *Term. Rep.*, 307. But in that case there was no devise in fee to the son and heir, and unless an estate tail had been implied from the words "if he happen to die *without leaving issue of his body, lawfully begotten* ," over, &c., he would have been disinherited; and Lord Kenyon seized upon this implication to give him an estate tail, as best answering the intention of the testator. It is said that in this case Lord Kenyon retracted his opinion as to there being no ground for giving a different effect to the same words, when applied to real and personal estate. But although he seems at first to have admitted the distinction, yet in the final judgment the distinction was disregarded.

In the case of *Agar v. Agar*, 12 *East* 257, the testator devised lands to his son and his heirs forever, charged with a sum to be paid to his daughter, with a right to enter, &c., for non-payment; and in case his son and daughter should both happen to die without leaving any child or issue, &c., over to his cousin R. A. Here it was evident that R. A. was not to have the land so long as there was any issue of either the son or daughter; and there was a strong, perhaps necessary implication, that if the issue of the son should fail at any time, not only the daughter, if then alive, but her issue if she were dead, should take the land; and certainly this would be as if the son died

leaving issue, which became extinct before the death of the daughter. It was manifest, therefore, without assuming that the words "without leaving issue" were of themselves necessarily indicative of an indefinite failure of issue, that the intention of the testator could only be effectuated by giving to them that interpretation. If the words had been deemed to be identical with, or equivalent to the general expression "if he die without issue," these would have been no necessity, after so many decisions upon those words, for any reasoning to prove that an indefinite failure of issue was intended; yet some of the judges argued to prove this, and evidently show that the word "leaving" was entitled to a restrictive effect. The case was decided on the ground of intention, deduced by argument, and therefore does not, in our opinion, decide that the words "if he die without leaving issue" must mean an indefinite failure of issue, but that they may and should have that interpretation, when it is necessary to effectuate the intention of the testator, or appears to accord with it.

The case of *Rommily v. James*, 6 *Taunton*, 263, though decided without much reasoning on the part of the court, is subject to an explanation similar to that which has been given of the preceding case. The testator devised all his estate to his brother H. S., subject to the devises afterwards made; he then devised his real estate in R., to his brother's son, H. S., to him and his heirs forever. At the conclusion of the will was the following clause, "and in case my brother and his son shall happen to die, *having* no issue of either of their bodies, then I devise all my real estate to my nephew, J. C., and his heirs." It was decided that H. S., junior, took an estate tail, remainder to H. S. senior in tail. It is to be observed, that in this case the word used in describing the contingency, is "having" and not "leaving," which is perhaps of no consequence. But if there were no other reason against a restricted interpretation of the words in that case, the fact that under such an inter-

pretation the lands given to the son would, upon his death without issue, in the life of the father, pass to the ultimate devisee, or be undisposed of, seems to be a sufficient ground for rejecting that interpretation. It would seem more probable to suppose that the testator intended the father, or his issue, to have the land devised to the son, if the latter should die leaving no issue, and that as the devise over was not to take effect unless both should die leaving no issue, it was intended that the survivor or his issue should take as long as there should be issue of either.

The case of *Dorsey v. Griffith* 4 *Maul. & Sel.*, 61, was in substance this, the testator devised land to his eldest son and his heirs, but if it should so happen that he should die and leave no issue, then to another son and his heirs, and if he should die without issue, then to a third son, &c. The case was decided in favor of an estate tail in the eldest son, but, as we believe, without any reasoning by the court. It may be assumed, however, that the testator meant the same thing by the words "die and leave no issue," and the words "die without issue." And, upon the mere question which of them should determine the meaning of both, it is not strange that the court in England should decide according to the fixed interpretation of the latter words.

The other British cases referred to in the argument in favor of an estate tail in this case, and in which the words "*leaving no issue*," or "without leaving issue" are found, are cases in which the first devise was to A. for life, or to A. generally, which was constructively the same, or cases in which the first devise was in tail or might well have been so adjudged without reference to the peculiar terms of the clause introducing the devise over. The first of these cases in point of time, is that of *Forth v. Chapman*, 1 *Pr. Wms.*, 667; the next that of *Dern v. Shenton*, *Cowper*, 410, both of which were before our revolution, though the last was in the same year. The others are *Chandler v. Smith*, 7 *Term Rep.*, 531 ; *Wood and wife v. Ba-*

*con,* 1 *East,* 259 ; *Cock v. Cooper,* 1 *East,* 229 ; *and Mortimer v. West,* 2 *Sim.,* 274. We reject those cases in which the first devise was for life, as not directly applicable to a will in which the first devise is in fee, because there is nothing in the devise for life to satisfy the inference in favor of the issue arising necessarily from making the devise over depend upon the failure of issue of the first devisee, which would not only be useless but unaccountable, unless it was intended that his issue, if any, should take after his death. It is certain that the ultimate devisee cannot take until the issue of the first shall fail, and as there is no devise over in case the first devisee should leave issue, there is the strongest implication that his issue, if any, was intended to take in succession until it fails. But this intention could, (according to the law of England,) only be effectuated by placing in him an estate descendable to his issue, for if the issue take as purchasers they would, by the law of England, take an estate for life only, there being no words of inheritance ; and unless there were issue at the testator's death they could not take even as purchasers. To effectuate, therefore, the manifest intention in favor of the issue, the estate of the ancestor, though devised in terms for his life, must have been enlarged into an estate tail. This was done by construction, and the clause introducing the devise over received a corresponding interpretation as referring to an indefinite failure of issue unless it was so restricted as certainly to repel this interpretation. If, therefore, the absolute restriction of the contingency to the failure of issue at the death of the first taker would defeat the implication of an estate tail, and thus deprive the issue of all benefit, or even reduce their estates to estates for life only, while there is no further disposition of the estate by the will, in the case of there being issue, it must of course require the strongest restrictive words to produce this effect; and the same words or circumstances which might be sufficient to restrict the contingency when the first devise is in fee, from which the

DANIEL
*vs.*
THOMSON, &c.

issue, if any, may derive the benefit intended, might well be deemed insufficient where the first devise is for life, from which the issue can derive no more benefit than if the devise over were dependent merely on the death of the first taker. For these reasons, and because, while there may be a very natural and proper motive for making the devise over after a fee simple depend upon the failure of issue of the first devisee at the time of his death, without assuming an intention to provide specifically for his issue, the only rational mode of accounting for such a reference to the failure of issue where the first devise is for life, is by assuming an intention to provide specifically for the issue, which is to be effectuated best, if not alone, by an estate tail in the ancestor; we regard the decisions in which the contingency in the latter class of cases has been held to be indefinite and unrestricted, as entitled to but little, if any weight in the present case. We remark, however, that even in the cases where the first devise is for life, there has been in England a great diversity of decision as to what words or circumstances were sufficient to restrict the failure of issue when referred to even by the words, "if he die without issue," to the death of the first taker. And that, even in those cases, the construction adopted has been generally placed, in modern cases, upon the question of intention to be collected from the whole will, and that some of the decisions have turned upon words or circumstances of apparently little importance, but still giving some indication of intention, to those who really sought to ascertain it.

Then, with regard to cases in which the first devise is expressly in tail, or in words tending that way, and which might be controlled by following words, we consider the cases of both classes as inapplicable to the present will, because, when the first devise is expressly in tail, followed by a devise over on failure of issue, not only is it presumed that an indefinite failure of issue is meant, because that is agreeable to the nature and general frame of estates tail with re-

mainder over, but as the reference to the failure of issue, however restricted, imports some benefit intended for the issue, and thus comports with the terms of the original devise, an indefinite failure must be presumed to have been intended unless the contrary most distinctly appears.  And where the first devise is doubtful, and may be construed as giving either an estate tail or an estate for life, still, as the inference arising from any reference to the failure of issue of the first taker, in case even of a devise for life, is in favor of an estate tail, and will, unless the failure of issue referred to be clearly and certainly restricted, authorize the construction of an estate tail by implication, much more, when the original devise is itself doubtful, will it suffice to determine its construction in favor of an estate tail rather than an estate for life, and therefor to require that the failure of issue referred to shall be understood as an indefinite failure, unless this interpretation is clearly excluded.  Wherever, therefore, it was referred to in such a case in words which were fairly susceptible, according to the prevailing rules of interpretation of embracing an indefinite failure of issue, they would be understood in that sense as most accordant with the nature of an estate tail, and as making, according to the avowed preference of the courts, a vested rather than a contingent remainder.

But notwithstanding these general considerations, there has been a diversity of opinion in the courts of England even as to the effect of particular words in restraining the import of the term "heirs of his body;" found in connection with the first devise, and followed by a devise over if the first devisee die without issue, and although, for the reasons stated, we do not consider those cases in which the construction of an estate tail, and an indefinite failure of issue was adopted as authority for the construction of the will before us, yet we cannot but regard those cases in which particular words or circumstances have been held sufficient to restrain the technical import of the words "heirs of

his body" in the first devise, and of the words "if he die without issue," introducing the devise over, as authority not merely for the same construction of the same words in the same context, but for the general principle under which they must have been decided, that these, like other technical words, must yield to the intention of the testator, to be determined not by these words alone but by the whole will. Many of the cases in which the question between an estate for life and an estate tail has been determined are stated briefly in the treatise on "limitations to heirs of the body," 7th vol. Law Library. Of these cases we will cite only that of *Gutton v. Howard*, the report of which we have seen only in 6th *Taunton*, 320. In that case the testator devised "all his estate to his wife, she first paying his debts and funeral expenses," and after her decease to the heirs of her body, share and share alike, if more than one, and in *default of issue to be lawfully begotten by me*, to be at her own disposal." The court decided that the wife took but a life estate with remainder in fee to each of her six children in one sixth-part. True, this decision was afterwards overruled in *Jesson v. Wright*, 2 *Bligh.*, *page* 1, but the case of *McNair's adm'r. v. Hawkins*, 4 *Bibb*, 390, decided by this court, is accordant with it and other similar cases, and both are referred to and followed in the case of *Prescott v. Prescott's heirs*, 10 *B. Monroe*, 56.

Then to return to the question upon the word *leaving*, and to the two anti-revolutionary cases. In the case of *Denn v. Shenton*, *Cowper*, 410, the devise was to S. S., and the heirs of his body, lawfully to be begotten, and their heirs forever, &c., but in case he shall die without leaving issue of his body, then to W. G. and his heirs forever, chargeable as aforesaid, (that is, with payment of £8 a year to M. S. during her natural life,) and also chargeable with the payment of £100 to A. B., within one year after W. G. or his heirs shall be possessed, &c. It was decided that the first devisee had an estate tail. There was but little reasoning on the part of the court. But Lord Mansfield, apparent-

ly considering the devise to S. S. and the heirs of his body, and their heirs forever, as not giving him an estate tail, because of the words "and their heirs" following heirs of the body, said the words "their heirs forever" were qualified by the subsequent words "in case he shall die without leaving issue," which clearly shows it to be an estate tail. But surely the previous express words "heirs of his body" would seem to have been entitled to as much weight, in showing what heirs were meant, as the mere implication from the subsequent words to which he refers; and at most, the decision only proves that there was not enough to overcome the evidences in favor of an estate tail, and to make the first devisee tenant for life. The case of *Wright v. Pearson*, 1 *Eden*, 119, *and Ambl.*, 358, decided in 1758, is much stronger. For the first devise was expressly to A. for life, remainder to the heirs, male, of his body, and for default of such issue male, to testator's five grand-children, or such of them as *should be living at the failure of A's issue male*, and to their heirs as tenants in common, &c. And although the devise over, thus limited, shows that the failure of issue referred to was a failue within a life or lives in being, it was decided that the first devisee took an estate tail. Surely then the case of *Denn v. Shenton* cannot prove that the phrase, "if he die leaving no issue," necessarily and in every connection, means an indefinite failure of issue. The decision in the other case was probably influenced by the rule in Shelly's case. But it shows that the restriction of the devise over to the failure of issue at the death of the devisee for life, did not prevent the conversion of his estate into an estate tail, in obedience to other indications in the will, and it illustrates our remarks on that subject.

The case of *Forth v. Chapman*, has been a leading case, and especially with respect to the doctrine that the words "leaving no issue" should have a different meaning, in their application to real estate and to chattels. In that case, as reported in 1 *Pr. Wms.*, 664, the testator gave his leasehold estate to his nephews,

DANIEL
vs.
THOMSON, &c.

William and Walter Gore, and all the rest of his estate, real and personal, to his nephew, William, and if either should depart this life, *and leave no* lawful issue for their respective bodies, then he gave said leasehold premises to the daughter of his brother, W. G., and the children of his sister, S. P. The question in the case related only to the leasehold premises. The Lord Chancellor, Parker, said, "if I devise a term to A., and if A. die without leaving issue, remainder over, in the vulgar and natural sense this must be intended if A. die without leaving issue at his death, and then the devise over is good; that the word die being the last antecedent, the word leaving must refer to that. Besides, the testator, who is *inops consilii*, will, under such circumstances, be supposed to speak in the vulgar, common, and natural, not in the legal sense." He also referred to the writ *formedon* in remainder, as showing that the word "leaving issue" referred to the death of the tenant in tail, and said, "if the words of a will can bear two senses, one whereof is more common and natural than the other, it is hard to say that the court shall take the will in the most uncommon meaning; to do what? to destroy the will." He said the reason why a devise of a freehold to one for life, and if he die without issue, to another, is determined to be an estate tail, is in favor of the issue, and that such may take it and the intent prevail; but that, in case of a term, the words cannot be supposed to have been inserted in favor of such issue, since they cannot by any construction have it. And he concluded that the same words in the same devise might have a different construction with respect to the two subjects, to make both devises good, and that it was reasonable it should be so *ut res magis valeat quam pereat*.

It is to be observed, however, that there had been a series of cases before that of *Forth v. Chapman,* in which, in wills of personalty and chattels real, the words if he die without issue had been interpreted according to their natural meaning, as referring to the

time of the death of the first taker—*Nichol v. Hooper*, 1 *Pr. Wms.*, 199; *Target v. Gaunt*, 1 *P. Wms.*, 452; *Pinberry v. Elkin*, 1 *P. Wms.*, 564, and in the subsequent case of *Atkinson v. Huchinson*, 3 *P. Wms.*, where a term was devised, it was held that the words "if the first devisee died without leaving any issue, must mean without leaving issue at his death;" and in *Reed v. Snell*, 2 *Atk.*, 642, Lord Hardwick made a similar decision, considering the word *leaving* as relating to the death of the first devisee.    The distinction taken by Lord Parker was, however, affirmed or denied by different judges, until it seems to have been abandoned, at least so far as regards the meaning or effect of the general words "if he die without issue." But in the case of *Biggs v. Bensley*, 1 *Br. Ch. R.*, 187, which was a case of personalty, Lord Thurlow said, "I agree with you that the general sense of dying without issue is at the time of the death, (and so many other judges have said, when giving to the expression a different meaning,) but he said "there should be as little contradiction as may be in the determination of the courts—the words *leaving* and *after* go far towards overturning the rule."    This is an admission that though the general words, "if he die without issue," be understood technically as referring to an indefinite failure of issue, the word "leaving," used with the others, has some specific force in pointing to the death of the person spoken of, and in thus restricting the contingency.    And it has been held to be sufficient for that purpose in the case of *Dunn v. Bray*, 1 *Call.*, 294, and in *Moore's trustees v. How's heirs*, 4 *Monroe*, 218, which were on devises of slaves.    And in the case of *Mosbey's adm'r. v. Corbin's adm'r.*, 3 *A. K. Marshall*, 280, which was also on a devise of a slave, this court decided that the words "if she die without issue," coming after a devise for life, should have a restricted interpretation, and did not convert the life estate into an estate tail or absolute property, and that the devise over, which was that the slave should return to the testator's estate in the contingen-

cy mentioned, was a valid executory devise. The main ground of this conclusion, besides the fact that the first devise was expressly for life, was that a contrary construction, by giving the absolute property to the wife, would vest it in her husband, and thus defeat the devise over, and violate the intention of the testator in limiting the estate for life.

But it is evident, that since by our statutes abolishing entails, a devise of an estate tail is turned into a fee simple absolute, and any subseqent limitation of the estate is made absolutely void; the argument just noticed applies with the same force against the conversion of a devise of lands in fee simple into an estate tail, by construction, whereby the devise over would be defeated, as it does against the conversion of a devise of a slave for life into an estate tail; and in the case of *Hart v. Thompson,* where a devise of lands was in question, the statute abolishing entails and remainders upon them, is referred to as furnishing a reason against such a construction of the words "if either of my children die without heirs of their body, lawfully begotten, his share to be divided between my other children then living," as by converting the previous devise into an estate tail would thus destroy the devise over. The same consideration furnishes an argument against the authority here, of the British decisions, which determine that a devise to A. and his heirs forever, is reduced to an estate tail by the words if A. die without issue, introducing a devise over. It is manifest also that Lord Parker's demonstration of the grammatical structure and meaning of the phrase "if he die without issue, or without leaving issue," applies equally whether the words are used in a devise of realty or of personalty. Chief Justice Boyle, in the case of *Moore's trustees v. How's heirs,* 4 *Monroe, supra,* said it was only by a forced and unnatural construction that the words could be made to mean an indefinite failure of issue, and from such knowlege as we possess of our own language, and of the common use of words, we do not hesitate to say, as our prede-

cessors time after time have said, that the words in their natural and common meaning refer directly and exclusively to a failure of issue at the time of the death of the person whose death is spoken of; then, in the language of Lord Parker, "if the words will bear two senses, one more common and natural than the other, it is hard to say a court should take the will in the most uncommon meaning—to do what? to destroy the will." And this court has never destroyed a will made since the abolition of estates tail, by giving to the words in question the forced and unnatural interpretation; nor did Chancellor Parker do it in the case before him. On the contrary, he interpreted the words as applicable to the leasehold estate, according to their natural meaning, so as to give effect to the intention of the testator in making the devise over, and because there was no necessity to give a different construction in order to effectuate any presumable intention of the testator; but in a devise of lands to A., and if he should die without leaving issue, then to B., he would take the words in a different, that is, in an unnatural and uncommon sense, not to make the will or any part of it void in law, and thus to destroy it, but to effectuate a manifest and lawful intention in favor of the issue, which could only be effectuated by an estate tail in the first taker; and he said this diversity of construction with respect to the different subjects would be reasonable, so as to make the devise good as to both—*ut res magis valeat quam pereat.* It would be a perversion of a principle, both of the argument and conclusion in that case, to make it an authority for giving a forced and unnatural construction to the words in question, with the effect, and indeed for the sole purpose of destroying a will which, according to the natural and common meaning of its terms, is legal and valid, and may be effectual in all its parts.

We observe further upon this case of *Forth v. Chapman*, that the chancellor says nothing of a case in which the first devise of lands is in fee simple, but his remarks apply only to a case in which the first de-

vise was expressly or constructively for life. In such a case, as has been demonstrated by many judges, the reference to the failure of issue of the first taker, as the ground or condition of the devise over, and the failure to make any disposition of the estate until there is a failure of issue, evinces an intention that the land shall not only go to, but that it shall abide with the issue as long as there is any, and this intention cannot, according to the law of England, be satisfied otherwise than by enlarging the estate for life, into an estate tail, because, if the issue take as purchasers, and not by descent, the issue living at the death of the devisee for life would take all together, *per capita*, and for their own lives only, and upon their death, though their issue might continue through successive generations, the estate would be undisposed of. But by our law words of inheritance are not necessary to pass an estate in fee simple. If, therefore, the issue can take as purchasers, under the implication arising from the words "if he die without issue, or without leaving issue," following a devise for life, they would take a fee as if the devise were to the issue and their heirs. And in the case of *Moore's trustees v. How's heirs*, 4 *Monroe*, it was said, and in fact made a ground of decision, that the issue might take as purchasers by implication under the words in question, which was, in effect, deciding that in a devise to A. for life, and if he die without issue, to B., a devise to the issue (of A.) and their heirs might be implied.

Under this view, the reasoning of Lord Chancellor Parker, which adopts the natural meaning of the words, where that is necessary to sustain the intention, and takes the unnatural meaning where that would be necessary for the same purpose, but rejects either where it would destroy the will, would authorize a conclusion under our law even in the devise of lands; such, he supposes, entirely different from that at which he arrives. For there is no necessity here of implying an estate tail in the devisee for life in order

to give an estate of inheritance to the issue. And as such an implication would give the absolute property to the devisee for life, contrary to the terms of the devise to him; and as it would thus not only fail to secure the intended benefit to the issue, but would destroy the devise over, the intention of the testator, and the maxim *ut res magis valeat quam pereat*, would seem to require that the will should be construed as giving an estate for life to the first devisee, with a remainder in fee to his issue, if there should be any at his death; and if there should be none, then as devising the land over to another. In the cases of *Carr v. Jennust*, and *Same v. Green*, 2 *McChord*, 66 and 75, briefly stated by Chancellor Kent in *note c, page 277* of the 4th volume of his commentaries, (6th edition,) the estate was devised to B. and C., to be equally divided between them, and delivered to them at the age of twenty-one, but should they *die leaving no issue*, devised over to D. and others. In one of the cases, (in the court of law,) it was decided that B. and C. had estates in fee. In the other case, (in equity,) it was held, that as the testator intended the estate to go eventually to the issue of B. and C., an absolute estate in B. and C. would be inconsistent with that intent, and, therefore, B. and C. took estates for life with contingent remainder in the issue as purchasers. In both cases, the words *die leaving no issue* were considered as referring to the death of the first devisees. Even in Virginia, where the British authorities on this subject seem to have been most sedulously regarded, Judge Roane, in the case of *Smith, &c. v. Chapman*, 1 *Hen. and Munf'd*, 297, where the first devise was expressly for life, said, in reference to the argument founded on the words "if he die without issue," the intention of the testator to provide for his grandchildren is the sole argument used to authorize and produce a destruction of their interests. And, referring to the statute of 1776, (abolishing entails,) and to that of 1785 dispensing with words of inheritance in passing a fee, he said the first cuts up by the roots the pre-

Daniel
vs.
Thomson, &c.

tense of implying an estate tail for the *benefit* of the issue, and the latter guarantees to a son or child claiming in remainder as purchaser, the absolute fee simple property in the land, page 299. And again, upon the same page, the same judge, after alluding to the case of *Tate v. Talby.*, *3 Call.*, as deciding that, by the act of 1776, the pre-existing laws should be referred to in deciding what was an estate tail even in a will subsequently made, says, "in a case, however, where the intention of the testator is alleged under pretext of providing for his issue, but in reality to infer an estate which will defeat them, it would seem proper to rebut that allegation by resorting to a posterior *general* law, without an ignorance of which it is impossible that any such intention should exist on the part of the testator.

In the same case, Judge Lyons said, page 302, I shall make short work of all questions arising on the construction of wills, made since the act of 1776; so far at least as it may be necessary to decide whether the testator meant to pass a fee tail or not. I will not *suppose*, after that act, that a man intended to convey an estate tail, (which the law has expressly abolished,) unless plain and unequivocal words are used, such as would of themselves create a fee tail without resorting to implication, as a devise to A., and the heirs of his body, or to A., and if he die without issue, &c." "For," he said, "if the donor did not mean an estate tail, but only used words which, by construction, might be so implied, in order to fulfill his intention, are they now without necessity and by implication only to be construed into a fee tail to defeat that intention? "We need not stop to inquire whether, in the case last put by this judge, and with which he was probably familiar, as a mode of creating, or a ground for inferring an estate tail, such estate did not arise under the former law by implication—necessary perhaps, but still an implication. Nor need we state the particulars of the case itself which are unlike that before us. But the case itself shows that the words, "if he die without issue,"

were not deemed inflexible in their reference to an in-
definite failure of issue, or in indicating a specific pro-
vision in tail for the issue, though coming after an
estate for life. And the extracts, which we have
made from the opinions of the judges, show that the
inference in favor of such an intended provision may
be repelled by the fact, that such an intention would,
if attempted to be, carried out by an estate tail, be ac-
tually defeated, but may be satisfied by the issue tak-
ing the fee simple as purchasers under the implied
devise in their favor. They show too, that although
the act abolishing estates tail declares that any estate
thereafter limited, so as according to the law as it
aforetime was, it would be an estate tail, shall be held
and deemed to be and continue a fee simple, &c., that
law, or its consequences, as well as other general laws,
may be taken into view in determining whether a par-
ticular limitation afterwards made does or does not
create an estate tail, and may operate to rebut the
presumption of an intention to create such an estate.

It is true, the supreme court of Virginia does not
appear to have carried these principles into other
cases. And although we have been referred to, and
have examined many cases decided by that court, and
some of them evincing great ability and research, we
have found none after that of *Smith v. Chapman, supra,*
decided in 1807, in which the words "dying without
issue," in a devise of real estate, were held to be re-
stricted by any word or circumstance in the will, or by
any consideration out of it. In some of these cases
it was decided that a devise over to the survivor, or
survivors, on the death without issue, of one of two or
more devisees, was not sufficient, though there were
other restrictive expressions, to restrict the failure of
issue to the time of the death of the first taker. But
in a series of cases decided in New York, and referred
to in the case of *Hart v. Thompson, supra,* in this court,
and also in a series of cases in this court, a devise
over to the survivors has been held sufficient though
it carried the fee. *Richardson v. Birney,* 5 *Dana,* 425;

DANIEL
*vs.*
THOMSON, &c.

*Hart v. Thompson,* 5 *B. Monroe,* 486; *Deboe v. Jowen,* 8 *B. Monroe,* 616; and *Prescott v. Prescott's heirs,* 10 *B. Monroe,* 56. In these and in all of the other cases in which the question has occurred in this court, upon wills made since 1776, the greatest repugnance has been shown to adopting the construction of the words "dying without issue," which would make them embrace an indefinite failure, and the court has never raised an estate tail upon those words. The other cases in this court are *Corbin v. Mosby's adm'r.,* 3 *A. K. Marshall,* 289; *Moore's trustees v. How's heirs,* 4 *Monroe,* 199; *Attorney General v. Wallace,* 7 *B. Monroe,* 611; *Black v. Cartmell,* 10 *B. Monroe,* 188, and *Northcutt v. Whipp and wife,* 12 *B. Monroe,* 65.

In none of these cases has an estate tail been raised by implication upon the words dying without issue, whether the first devise was for life or in fee or without additional words, or whether it devised lands, or slaves, or personalty, or all, by the same words. In none of them has there been an attempt to show, by a general citation of cases, that the decision was accordant with the current of British adjudications, either before or since our revolution. In some of them the destinction between the meaning of the words in question, in wills of personalty and realty, is denied, and the authorities referred to, though in a case involving land, seem to have related mainly to wills of personalty. In none of the cases is the statute abolishing entails referred to as binding the court to decide according to the cases adjudged in England or Virginia, previous to its date, though it is referred to in *Hart v. Thompson* as a reason for not implying an estate tail. And it is most remarkable, considering that we had derived our laws from Virginia, that her statute of 1776, abolishing entails, and that of 1785, to the same effect, were the law here until the re-enactment of the latter statute of Kentucky in 1796, that in not one of the cases decided by this court has there been, so far as we can discover, the slightest reference to any of the Virginia cases, either for the construc-

tion and effect of the statute, or for authority on the question whether the will created an estate tail.

With regard to the statute of 1776, as its effect upon the construction of wills made after its passage had not been judicially decided before Kentucky became a state, nor even before the re-enactment of the statute by Kentucky, (16th section of the act of 1796, regulating conveyances, *Stat. Law*, 442,) of course its enactment here gave no force to any subsequent construction it may have received in Virginia, and after so many cases have been decided here evidently upon the assumption that it did not perpetuate the force of particular words, or the authority of particular decisions, but left the question whether an estate tail was or was not created to be determined as a question of intention, and like every other question of intention, by a fair application of the rules of construction, and that it had no operation in converting an estate tail into a fee simple, until it should first be ascertained that there was an estate tail; and especially after the declaration in the case of *Hart v. Thompson,* that its effect after an estate tail was ascertained, should be a reason for avoiding the construction of an estate tail, we should not feel at liberty to go back and give a different const. action to the statute, and one which might bring the previous decisions of the court to a new test, and change the titles and rules of property founded on them. If, however, this were the first case in which the question of an estate tail, and of the effect of the words "dying without issue" or "without leaving issue," had been presented, we should feel bound to say, that although the framers of the act of 1776 may have had it in their minds that the same words, which had before been adjudged to indicate an intention to create an estate tail, or to require its creation by construction, would still be used to indicate the same intention and would therefore be adjudged to create or require an estate tail, they did not enact this opinion in the statute, nor perpetuate it as the law of the land. They did not enact that the words "if he die without issue"

should always mean an indefinite failure of issue, or that no other words or circumstances, but such as had before been held sufficient to restrict their meaning, should thereafter be deemed sufficient for that purpose. They did not mean to repeal the great law of construction, which makes intention the polar star, nor to abrogate the other rules established for the ascertainment of intention, nor to take from the courts any part of their judicial power of determining upon the instrument before them, and, according to the settled principles of construction, whether it so limited the estate conveyed as to make or require such an estate, as by the law as it aforetime was, would be an estate tail. They only meant to condemn estates thus ascertained to be estates tail, by converting them into absolute fees simple, and cutting off all subsequent limitations.

The words "as the law aforetime was," may be satisfied by referring them to the previous law, which defined an estate tail to be an estate descendible only to heirs of the body, or to a particular class or sort of such heirs; and the statute of 1796 may be construed as declaring that an estate so limited as thus to restrict the descent, "as the law aforetime was," shall no longer have that effect, but shall be held and taken to be a fee simple absolute. The object of the statutes was to interdict and prevent the attempt to control the transmission of property indefinitely, as in case of an estate tail. And we are satisfied that our statute of 1796 did not intend, and should not operate to convict a testator of making such attempt, and thus to destroy his will, legal and valid according to the natural and common use of the words here, because he may have happened to use words which, upon hunting up British decisions from the date of the statute *de donis*, and comparing conflicting determinations, may be shown to have been deemed sufficient in England to create an estate tail, or to indicate such an intention.

Our ancestors who emigrated from England brought with them, it is true, the statute *de donis*, and the usage of making estates tail. In Virginia, especially, such estates, up to the very period when they were abolished by the act of October, 1776, were not only familiar to the people, but were favored by the legislature, and were more secure than they had been for centuries in England. The sudden abolition of them by act of Assembly could not immediately have the effect of banishing from the minds of the people familiar ideas and usages connected with them; and it may have been properly decided by the courts that a will, made immediately after the enactment of the statute, should have the same construction as one made immediately before. But as the operation of the statute must, in process of time, have had the effect of destroying all motive on the part of those who observed it, for attempting or designing to create an estate tail, and thus to diminish and finally to destroy all presumption of such an intention, it operated indirectly upon the use of language as a means of conveying intention, and upon its proper interpretation as a means of ascertaining it. The change of government, which at once produced the abolition of entails, had its effect also in changing in other particulars, the ideas of men and the laws of property. The act of 1785, dispensing with the necessity of words of inheritance in creating a fee simple, had a direct influence upon the forms and language of conveyances, and was entitled to effect in the construction of devises. But the act directing the course of descents, passed at the same session, by which the preference for males and the law of primo-geniture were abolished, and the inheritance was opened to all the children of an intestate, or the representatives of such as were dead, tended more certainly and more rapidly than even the abolition of entails, to establish ideas of equality in the transmission of estates, with which entailments upon particular lines of heirs are utterly inconsistent. This new course of descent, changed as

DANIEL
vs.
THOMSON, &c.

we suppose, at once the practical import of the words "heirs," and "heirs of his body," and "issue," as words of limitation, from what it was by the previous law, which preferred males to females, and the first born among males. It consequently changed the nature of an estate tail, limited to the issue generally; and it would seem irrational to suppose that a testator, with a view of providing specifically for the distant posterity of himself or any other person, should entail upon them even if he could do it, a small piece of land to remain inalienable as long as the issue should last, subject to division and re-division at every descent, and upon the extinction of that line of issue, to pass to the posterity, however numerous, of some other line or lines. It would be a much better and more obvious provision to allow the land to be sold at the discretion of a parent, so that the proceeds might be invested in larger quantities of cheaper lands, by which his issue, if any, would be benefitted. But while it could not be presumed that an intelligent testator, under the circumstances and considerations which had been adverted to, could intend so vain and irrational a thing as to entail two or three hundred acres of land, or indeed any quantity, upon any devisee and his issue generally, as long as it might last; it might be very natural and proper that, in contemplation of the possibility or probability of this first object of his affection and bounty, dying without issue he might desire to make such a disposition of the estate intended for him as would enable him to dispose of it as he pleased, if he should have issue to provide for at his death, but would pass it over to some other object of the testator's affection, if there should be no such issue. A devise to A. and his heirs, but if he should die without issue, or without leaving issue, over to B. and his heirs, would, according to the literal import of its terms, make precisely such a disposition, whereby the testator would control the estate, as he lawfully might do in case A. should leave no issue to provide for, but would subject *it to the con-*

trol of A., and of the law, if A. should leave issue at his death.

It may have been impracticable for the courts of Virginia, called upon at short intervals to give construction to the words "if he die without issue," or other similar expressions, to give effect to the general considerations which tended to displace the presumption of an intention to create an estate tail, or to use the words in question in any other than their natural sense. They did not even feel at liberty to give effect to words and circumstances in the will itself, which other courts have deemed sufficient to restrict the sense of the words "if he die without issue" to the death of the person referred to. The consequence was that the legislature of Virginia, in 1819, passed an act declaring that those, and other similar words in wills, &c., thereafter made, should be interpreted as referring to the time of the person's death, unless a contrary intention clearly appeared in the instrument. Similar statutes were enacted in other states, in which a similar course of decision had been pursued; and even in England, where all of the same causes did not operate to produce a change in the use and sense of the words, a statute of like import was passed in the first year of the reign of the present Queen. It is impossible to suppose that these statutes were passed for the purpose of fixing upon these particular words a new and arbitrary meaning, different from that in which they were commonly used, or in which they expressed the real intention of the parties who might use them in wills and other instruments of conveyance; on the contrary, these enactments prove that however proper the technical or artificial interpretation of the words may once have been, it had become, by change of times and circumstances, antequated and inapplicable, and that by a continued adherence to it, notwithstanding this change, the courts were, in most instances rather defeating than effectuating the intention of testators and others, and were thus perverting the primary objects of judicial con-

struction. They prove too, and the same is proved by the constantly renewed contests in the courts of England and Virginia, upon the effect of the words "dying without issue," and of other words or circumstances supposed to qualify them, that even in those countries, where from year to year, and by decision after decision, the courts had reiterated the judicial interpretation of the words as drawn from ancient and continued precedents, they had not been able to stamp that interpretation upon the minds and transactions of men of new and more enlightened generations, or to enforce, amidst the great and constant changes of institutions and laws and manners and language, a continued use in the same artificial and unnatural sense, of a particular formula of words not appropriated to legal proceedings, nor peculiar to them, and therefore not properly technical, but appropriately and accurately used by common men in the description of an ordinary natural event, which is understood by all.

Although the authority of this interpretation may never have been expressly disclaimed in this court, it has constantly been evaded in regard to wills made since 1776, by seizing hold of circumstances deemed sufficient to establish the natural sense of the words. The judicial interpretation has, in some of these cases, been pronounced to be unreasonable, and it has never been applied with the effect of raising an estate tail, or of destroying any part of the will. The circumstances which have operated to overthrow this unnatural interpretation, even when it was firmly established, have, together with other co-operating causes, prevented it from having ever been established here. It cannot be regarded as a rule of property here, because it never has been established or recognized as such by this court; never has practically operated as such in actual transactions, and never has been known as such even to the legal profession, much less to the community at large. We have reason to know that the learning and even the common rules on the subject of estates tail are almost entirely dropped

from the regular study of the profession, and that but few practicing lawyers bestow any attention upon them, until their engagement in a particular case may occasionally render it necessary. It has even been urged in argument that some of the judges who have decided upon the question of estates tail, had but little acquaintance with the subject—and doubtless it may be shown that the decisions of the court are not in accordance with the weight of British and Virginia authority—but our own researches, made principally in reference to this case, convince us that although there may have been no diversity in the British adjudications as to the meaning and effect of the words "if he die without issue," when found in a devise of real estate, and unrestricted by other words or circumstances, there is great diversity upon almost every other point connected with the subject.

Shall we go then to these decisions, which have never operated here, to find a rule of property founded on an interpretation of particular words, which has never been practically applied here, which is unknown to the community, and contrary to the natural sense and common use of the words among us? and shall we do this for the purpose of destroying a will, on the ground that its devises, valid according to its terms as understood among ourselves at the present day, are void according to the interpretation put upon the same terms eighty or five hundred years ago in another country, under a different state of law and usage, and never judicially applied nor practically adopted here? Such a resort with such a result would, in our opinion, not only contravene the prior decisions of this court, and shake the rules of property which they have declared, but would be deriving our rule of property upon this subject from principles and sources inapplicable to our condition and laws, and would operate to the surprise as well as to the injury of our citizens. The rules of property which are of extensive practical operation, and intended to govern the transactions and rights of individuals, must be based upon the

common notions, and accord with the common under-standing of the community. The interpretation now urged upon us is contrary to the common sense of all unlearned men. It is impossible for them, and difficult even for lawyers, to comprehend how or why the words "if he die without issue" should be taken to mean "whenever his issue shall fail, at or after his death," or how a man who has died once leaving issue, can ever afterwards be said to have died without issue. Experience proves that the men of the present century will not be governed by this rule. The judicial power of England and Virginia, where it had been long established, could not maintain it, and it would be as vain as it would be unjust to attempt now to introduce it here. We do not admit that it is or ever has been a rule of property in Kentucky, as applicable to wills, made since 1776; and to declare it so now would be to introduce a new rule. Even the purchaser from C. R. Thomson was not confident of his title, although his purchase was prior to most of the decisions of this court on the subject. He says other lawyers differed from him. He took precautions in his contract for his own safety. And we are satisfied that few men, with a knowlege of the decisions of this court, would give full price for land in fee simple on the faith that the words "if he die without leaving an heir of his own body," coming after a devise in fee, would be interpreted to mean an indefinite failure of issue.

The argument that a legislative act is necessary to authorize the court to give a restricted interpretation to the words in this codicil, so far as it is founded upon the statutes relating to estates tail, is answered by the construction which has been heretofore impliedly given to it, and which, in this opinion, has been expressly given. If the court had heretofore regarded that act as binding them down to the interpretation which these words had received before October, 1776, or if it had in a train of decisions adopted that interpretation, a legislative act might have been necessary

here as in other states, to authorize or to declare a change of the rule; and we have no doubt that if such decisions had been made, or if the attention of the legislature had been called to the subject at any recent period, such an act would have been passed. As no such decisions have been made, no legislation was necessary to authorize the court to exercise its power of construing not only wills, but the act of 1796 itself, according to the ordinary rules of construction, and under all the considerations which may properly bear upon the subject, among which the construction which it has heretofore impliedly given to the statute cannot be lightly regarded. If, however, we were bound upon this question of an estate tail, more than upon any other arising in the construction of a will, to follow the British decisions prior to October, 1776, we should not feel bound to abandon the fundamental rules of construction, to destroy the express devises in the will, and thus to defeat the manifest intention of the testator, but, upon an exhibition of cases anterior to the period referred to, interpreting the words "if he die without *leaving* issue or heirs of his body," coming after a devise in fee simple, and sufficiently numerous and uniform, to establish a rule applicable to that precise case. We should require this because we are satisfied, not only from the natural meaning of the words, but from the whole context of the will, and from all the circumstances and considerations connected with it, that the testator meant to provide only for the event of C. R. Thomson's dying without leaving an heir of his body at his death. But although such a precedent was asked for during the argument none such was produced, and we have found none. The cases of *Forth v. Chapman* and *Denn v. Shenton*, the only ante-revolutionary cases referred to' in whicn the word "leave or leaving" is introduced, have already been shown not to come up to the requisition. And as the cases of *Pells v. Brown, Hansberry v. Cockerell, Gulliver v. Wickett,* and other old cases, established the doctrine that the words "if he die

without issue" may be restricted by other words or circumstances, the sufficiency of which must of course be judged of by the court, and as no ante-revolutionary case decides that the additional word *leaving* is not sufficient where the first devise is in fee simple, we should be at liberty, notwithstanding the supposed chains of the statute, to exercise our own judgment upon its sufficiency. And as, although the expressions "die without issue," and "die without leaving issue," in our opinion both refer to the time of the death, the word *leaving* makes this reference somewhat more precise and special, and is moreover a variation from the words to which the indefinite meaning was originally attached, and has been deemed sufficiently restrictive in cases of personal property, we should feel authorized, in order to sustain the will, to decide that it is sufficient in the present case, and especially, when taken in connection with the evidences furnished by the body of the will, that the testator was utterly regardless of the issue of his children, but that he was anxiously providing something additional for his daughters; and with the fact that while the fee simple is left absolute in the eldest son, Wm. Z. Thomson, who probably was married and had issue, it would be strange that the testator should attempt to provide for the issue indefinitely of two younger sons, one of whom was never married, was so dissipated as to render it probable that he never would marry, and who is actually dead without leaving issue, and the other, though since married, had had no issue when this suit was brought. These, and other considerations arising from the face of the will, tend to fortify the construction which we would give to the words in the codicil; and the more general considerations arising from the laws which have been referred to, from the habits of the citizens, and from the absence of any usage to provide for remote and unborn issue, otherwise than by giving an estate in fee to the parent, or an estate for life with remainder, seem to preclude all presumption that this testator, a man of property and intelligence, as *is*

manifest from his will, should have made the absurd attempt to provide indefinitely for the issue of his two younger sons, and upon failure of their issue, whenever it might happen, to pass the same land over by force of his will to his daughters or their representatives.

If, as we have decided, we are not confined to decisions made before October 1776, the past revolutionary cases which have been stated, furnish additional ground for the conclusion that the word "*leaving*," with the other circumstances referred to above, are sufficient to restrict the contingency to the time of C. R. Tompson's death. And as the cases decided by this court seem to establish the principle, that any circumstance which shows that the testator, in using the words "if he die without issue," looked to and intended to provide only for the case of a failure of issue at the time of the devisee's death, would suffice to restrict the contingency and the devise over to that time, we should, in any view of the question, feel authorized to decide, upon our own conviction of what the testator intended, that the contingency was sufficiently restricted in this case by the words of the contingency themselves, in connection with other circumstances and considerations already adverted to.

But we are conscious that a decision of the case on this ground would be placing the rule of property, so far as it depends upon the interpretation and effect of the words "if he die without issue," under the discretion of the court, and the variable opinions or feelings of its judges, some of whom might think these words sufficiently restricted by words or circumstances which others would consider as wholly inadequate; and at any rate no man would know or could tell the nature of an estate which depended on the interpretation of these words, until there had been a decision on the particular will on which the question might arise. To make a rule certain and stable it must either be decided that the words must be taken in their natural sense, unless a contrary intention is plainly expressed,

DANIEL
*vs.*
THOMSON, &c.

A testator devised to his sons J. K. T. and C. R. T. several slaves and a tract of land, in one clause of his will, "to them and their heirs forever." In a codicil attached to the will is the following clause: "It is my wish that all the property that may be included in this my last will and testament, to my sons C. R. and J. K. Thomson, in case either or both dying without leaving a lawful heir, begotten of their own body; in that case, the property so left shall be equally divided among their sisters, or their legal representatives." Held—1. That the sons took a defeasable fee in the land, subject to be defeated upon their death without leaving issue of their bodies living at the time of their death— it was not an estate tail. 2. That the limitation over to the sisters was not too remote,

but valid; not
in conflict with
the law against
perpetuities.

or that they must be taken in the sense of refering to an indefinite failure of issue, unless expressly and conclusively restricted to the death of the devisee, or unless restricted in the precise manner which has previously been adjudged to be sufficient. This last alternative would deny to present and future judges the power which their predecessors have exercised, of judging for themselves what words and circumstances sufficiently indicate an intention to restrict the contingency, which we should deem to be inadmissible; And between the other two alternatives we are prepared to decide, for reasons which have already been indicated, that the words "if he die without issue, or without leaving issue or heirs of his body," or other words of similar import, are to be interpreted according to their plain popular and natural meaning, as referring to the time of the persons death, unless the contrary intention is plainly expressed in the will, or is necessary to carry out its undoubted purposes. This conclusion accords substantially with that expressed in the former opinion, and we may refer, in confirmation of its propriety, to the fact that in the Revised Statutes, passed since the former opinion was delivered, and which is the first revision of the statutes in the present century, the legislature has fixed the meaning of the words "if he die without issue or heirs of his body," and other similar expressions occuring in wills and other conveyances thereafter made, as referring to the time of the death of the person spoken of, unless a contrary intention clearly appears, &c. Which proves that we have adopted the correct interpretation of the words, as understood and used by the community. And the effect of our decision is to apply the same uniform interpretation to wills made before, as to those made after the enactment of the statute.

Wherefore, the decision is affirmed.

HARLAN, and MOREHEAD & BROWN, for appellant; ROBINSON and JOHNSON, for appellee.